No. 24,287.

R. E. CALBERT, *Appellant,* v. C. S. WINCHESTER and ALLEN WINCHESTER, *Appellees.*

SYLLABUS BY THE COURT.

PERSONAL INJURIES—*Fall in Slaughter Room of Packing House—Contributory Negligence of Plaintiff—Findings.* The record examined in an action for damages for injuries sustained in the slaughter room of a packing house by defendants' customer, and held that in the light of all the evidence and the court's instructions, the jury's special findings were not necessarily inconsistent with the general verdict so as to compel a reversal of the judgment which was based on the general verdict.

Appeal from Reno district court; WILLIAM C. FAIRCHILD, judge. Opinion filed December 8, 1923. Affirmed.

*Carr W. Taylor,* and *John H. Connaughton,* both of Hutchinson, for the appellant.

*Walter F. Jones,* and *C. M. Williams,* both of Hutchinson, for the appellees.

The opinion of the court was delivered by

DAWSON, J.: The plaintiff brought this action for damages sustained by falling on the wet and slippery floor of the killing room in defendant's packing house in Hutchinson.

Plaintiff conducted a retail grocery and meat market at Medora, a few miles from Hutchinson. He was accustomed to go to defendants' plant two or three times a week for his meat supply. The entrance to the meat room for customers like plaintiff who came to select meat for their retail trade was along the south side of the killing room, but that portion of the room was not railed off from the rest of it. There were two or three pillars in the killing room some seven or eight feet distant from the south wall, and the space between these pillars and the south wall of the room constituted a sort of passageway, but there was also testimony that customers sometimes walked straight through the killing room without regard to the passageway. About fifteen feet north of this passageway was a table where men were cleaning hogs. On the day plaintiff was injured he turned aside from the passageway to speak to some men working at the table, and when he started to continue his journey he fell and was severely injured. He testified:

"Q. What kind of an approach was there to the west side of the meat market? A. No other way than through the slaughter room. . . .

"Q. In passing through that slaughter room, did you pass across the center of the room? A. Right across, you might say, the center, yes, sir. .

"Q. . . . How big was that slaughter room? A. Well, it was possibly twenty-five feet wide across the building. I should judge that. . . .

"Q. What was the width of the slaughter room, north and south? A. North and south where they butchered their hogs, it was about twenty feet. . . .

"Q. When the hogs were washed and cleaned, which way did the water flow on the floor? A. It was practically all over the floor. . . .

"Q. Tell the jury exactly the route you traveled? A. We came in off of the street on the south side,— . . .

"A. I did that; and turned to the left there to go right through this slaughter room across to this meat market. . . .

"A. . . . On my right was Mr. Goble and a colored man by the name of Snowden. They were dressing a hog, and as I went through there Mr. Goble spoke to me, accosted me and I hesitated just a moment. He spoke to me about my boy playing ball and wanted to know whether they could get him to pitch ball for them. I told him he would have to see him, I didn't know as to that, and I advanced on then. Those boys were facing the east, Snowden and Goble was, and I passed by them and possibly went ten feet to the central part of the building and there I slipped and fell to the floor. . . .

Calbert v. Winchester.

"Q. Going back just before you fell, what was the condition the floor was in? A. It was in a very bad condition. . . .

"A. Well, it was covered more or less with blood and different fragments of meat and a considerable amount of water, because this man was flooding this string of hogs with a stream of water as big as my thumb, I should judge, and this water was running all over the floor. . . .

"Q. You may state whether or not that was the usual and customary route taken by yourself? A. Yes, sir; it was. . . .

"Q. You may state whether or not it was the usual and customary route used by other customers? A. It was."

On cross-examination, plaintiff testified:

"Q. You started to walk straight across from the east door of the killing room to the west side, along the north wall of the cooling room? [south wall of killing room.] A. Yes, sir. . . .

"Q. How far from the wall did you come along, as you walked west, how far from the wall were you? A. When I was walking in from the east going west, to pass this string of hogs I was out just barely enough to pass this man that was flooding the hogs, and as I got past him Mr. Goble spoke to me and I jogged over a little to the right where he was butchering this hog, just a step, and I·proceeded on after speaking to him just a minute; I proceeded on west about ten feet from them and there is where I fell, about middle way of the building, I should judge. . . .

"Q. You say Mr. Goble and a colored boy were cleaning a hog? A. Yes, sir. . . .

"Q. Were they approximately in the middle of the killing room? A. You might say right around near the middle of the killing room. . . .

"Q. Did you go over to the table where they were working and talk to him? A. Just stepped aside, in front of this young man, like, as he was talking to me about my boy playing ball.

"Q. Then you went straight west? A. I went west. . . .

"The Court: I want to get this straight. As I understand you, you came in from the south and went up to the middle of the place where they were dressing this hog because the young man spoke to you about your son, and then turned and went direct west?

"A. No, sir; I was going west when he spoke to me. Of course I continued on west then. He was just to my right . . . I jogged over where this young man was that spoke to me, and then started across to the door of the meat market."

There was testimony for defendant tending to show that the eight-foot space between the south wall and the row of pillars was the regular passageway and that it was always kept clean; and testimony, also, that plaintiff fell in jumping across a pail of water, and that he had repeatedly told witnesses that the accident was caused by his own fault.

A witness for defendant testified:

"Q. Now, Mr. Winchester, is there a walk or passageway leading from the hall to the sausage room?  A. Yes, sir.  . . .

"Q. Is that along out by the wall?  A. Yes, sir.

"Q. How large a passageway is that?  A. Probably seven to ten feet.

"Q. Is that seven to ten feet used in the killing or cleaning of hogs?  A. No, sir.  . . .

"By the Court: It strikes me you are taking up a lot of time with this. There is no claim in the testimony that this passageway wasn't in perfect condition.

"Counsel for plaintiff: What passageway?

"By the Court: The regular passageway.

"Counsel for plaintiff: There is a claim of that kind; yes, sir.

"By the Court: I haven't seen any or heard any testimony of that kind.

"Counsel for defendant: We have assumed it was our duty to show that it was in good condition.

"Counsel for plaintiff: We except to the remarks of the Court on that proposition, because that is a question for the jury.

"By the Court: I am going to instruct right along that line. I don't want to take up any more time than we have to with it. Exception allowed.

"Cross Examination.  . . .

"Q. People that come there to buy, customers, pass through that way all the time?  A. Yes, sir.

"Q. And that was the usual route traveled?  A. Yes, sir."

Another witness testified:

"Q. Is there a passageway along that wall, that South wall?  A. Yes, sir.

"Q. For people to go?  A. Yes, sir.

"Q. Is that the passageway usually used by people going through that room?  A. Yes, sir.  . . .

"Q. Could you see from where you were working at the table day after day during the time you worked there, where people walked when they came from the hall to the sausage room?  A. Yes, sir.  . . .

"Q. And where did they usually walk?  A. Well, sir, probably four feet from the south wall.

"Q. Straight across?  A. Yes, sir."

The court instructed the jury, in part, thus:

"If you find that the plaintiff was injured at some place other than the usual and accepted. traveled passageway across or through the butchering room to the door of the room where the meat products were stored, and that he was not induced by invitation or allurement of the owner, expressed or implied, to the position and place where he was injured, then he was a mere licensee, and the defendant assumed no duty to the plaintiff other than to see that no wanton or wilful injury was inflicted on him, and in this case there is no evidence that the plaintiff was wantonly or willfully injured and therefore if you find the plaintiff was injured on defendant's premises at a place or point other than the usual and ordinary passage

Calbert v. Winchester.

way used by persons going to and coming from the meat room intended to be reached by the plaintiff through the butchering room, then your verdict will be for the defendant.

"The jury are instructed that if there were two routes or ways to reach the meat products room to which plaintiff claims he was going, it was his duty to take the safe route, and if you find that the route which he took was dangerous, and further find that plaintiff knew of its danger, or by the exercise of ordinary and reasonable care should have known of such danger, and that such danger did not exist by the other route, which fact was also known to him, or by the exercise of ordinary and reasonable care should have been known to him, then your verdict will be for the defendant."

The general verdict was in favor of the defendant, but certain special findings were made by the jury which form the basis of this appeal. These must be set out in detail:

"No. 1. Q. Were all customers of the defendant who desired to inspect meat before purchasing required to pass through the said cleaning room in order to get into the cooling room where meats were displayed?  A. Yes.

"No. 2. Q. Did the defendant use ordinary care in providing a safe passageway for customers through said cleaning and dressing room into said cooling room?  A. No.

"No. 3. Q. Was the floor of said cleaning and dressing room wet and slippery at the time plaintiff was crossing over same to enter into the cooling room for the purpose of inspecting meats for purchase?  A. Yes.

"No. 4. Q. Did the defendants give any warning or other notice of any kind to the plaintiff that said floor was slippery and dangerous for use in passing to said cooling room?  A. No.

"No. 5. Q. Was the plaintiff exercising ordinary care in passing over said floor into the entrance into said cooling room at the time he slipped and fell and sustained the injury?  A. Yes. . . .

"No. 7. Q. Did the defendants know that the passageway used by customers in going to the sausage room through the killing and cleaning room was slippery?  A. Yes.

"No. 8. Q. Could the defendants have provided a safe entrance and passage way into the sausage room for their customers?  A. Yes."

Plaintiff's motion for judgment on the special findings was overruled; likewise their motion for a new trial. He now contends that the special findings were inconsistent with the general verdict. At first blush they may seem so, but it is clear that the general verdict was induced by the pertinent instructions of the trial court quoted above, to which plaintiff made no objection in the trial court and makes none here. While there was a dispute at the trial as to whether that seven or eight feet of space in the killing room next to the south wall of that room was a passageway or whether the whole slaughter-room floor was the passageway, the seventh finding

seems to indicate that the jury held to the view that the space between the wall and the pillars was the passageway, and while that finding and the others indicate that the jury believed the passageway was slippery and dangerous, yet plaintiff was not injured on the passageway. He fell near the middle of the room, to which point he had turned aside for private conversation with defendants' employees, so any negligence of defendants in the care of the passageway was immaterial. He was not injured there, nor anywhere that he had a right to be except as a mere licensee whose rights and the defendants' obligations toward whom were correctly defined by the trial court.

The general verdict was consistent with the evidence, especially that part of it adduced by the prevailing party touching the existence and common use of the passageway, and not necessarily inconsistent with the special findings when these are viewed in the light of all the evidence and the instructions. Consequently the judgment cannot be disturbed.

Affirmed.